LUIS FONTÁNEZ, demandante y apelante, *v.* LA SUCESIÓN DE JUAN BUXÓ OCASIO, compuesta de DOLORES BUXÓ OCASIO, demandada y apelada.

No. 3748.—*Visto:* Enero 27, 1927. *Resuelto:* Febrero 4, 1927.

1. HIJOS NATURALES—RECONOCIMIENTO OBLIGATORIO—ACCIÓN DE RECONOCIMIENTO O FILIACIÓN—EVIDENCIA—SUFICIENCIA DE LA MISMA—ACTOS DEL PADRE DEMOSTRATIVOS DEL RECONOCIMIENTO—INTENCIÓN DE RECONOCER.—El hecho de que un padre putativo llame en algunas ocasiones *hijo* al demandante, lo bendiga y en una ocasión le dé dinero, no demuestra cumplidamente la intención de aquél de reconocer ni la posesión continua del estado de hijo natural.

2. HIJOS NATURALES — RECONOCIMIENTO OBLIGATORIO — ACCIONES DE RECONOCIMIENTO O FILIACIÓN—EVIDENCIA—SUFICIENCIA DE LA MISMA—POSESIÓN DEL ESTADO DE HIJO NATURAL.—La posesión continua del estado de hijo natural ha de revelarse por actos que demuestren la voluntad del padre—o de su familia en su caso—de tener como tal hijo natural al que pretenda ese reconocimiento obligatorio y acrediten que el hijo mantiene, con aquel carácter, relaciones constantes con el padre y, en su defecto, con el de la familia.

SENTENCIA de *Pablo Berga,* J. (Humacao), declarando sin lugar demanda de reconocimiento o filiación, sin costas. *Confirmada.*

*Bolívar Pagán,* abogado del apelante; *González Fagundo & González, Jr.,* abogados de la apelada.

EL JUEZ ASOCIADO SEÑOR HUTCHISON, emitió la opinión del tribunal.

El demandante en un pleito de filiación apela de una sentencia adversa, y dice que:

"La Corte de Distrito de Humacao cometió error al apreciar la prueba y declarar que era insuficiente para justificar cumplidamente la pretensión del demandante."

La demanda parece haber sido radicada poco después del fallecimiento del padre putativo, aunque el demandante llegó a su mayoridad como siete años antes de tal acontecimiento.

En el argumento del apelante se asume que el juez sentenciador aceptó como verídica la prueba del demandante; pero no hallamos base satisfactoria para esta presunción en la opinión que se hizo formar parte de la sentencia dictada por la corte inferior.

En su demanda enmendada, el demandante alegó, entre otras cosas, lo siguiente:

"Que durante el embarazo, y antes del embarazo, y al tiempo del nacimiento de dicho demandante, y después del nacimiento de dicho demandante, Regina Fontánez Martínez fué conocida viviendo en concubinato con dicho Juan Buxó Ocasio; que dicho demandante, durante la vida de Juan Buxó Ocasio, se halló en la posesión continua del estado de hijo natural de Juan Buxó Ocasio; que dicho Juan Buxó Ocasio tuvo siempre, pública y privadamente, a dicho Luis Fontánez por hijo suyo, llamándole aquél 'hijo' a éste, y aquél contestando como tal al éste llamarle 'papá'; que dicho Juan Buxó Ocasio siempre atendió y sufragó la vivienda, la educación, la asistencia médica y el sostenimiento de dicho Luis Fontánés y aquél le prodigaba a éste, pública y privadamente, afectos paternales; y que dicho Juan Buxó Ocasio, además, expresó reiteradas veces su voluntad y su propósito de reconocer legalmente a dicho Luis Fontánez como su hijo."

Con referencia a esta alegación y a la prueba presentada durante el juicio, el juez de distrito dijo:

"La prueba en este caso para sostener dicha alegación, no sugiere la presunción de que existiera concubinato entre Juan Buxó Ocasio y Regina Fontánez Martínez, ni la posesión continua del estado de hijo natural en el concepto público por actos del alegado padre demostrativos de un verdadero reconocimiento, perfectamente voluntario, libre y espontáneo; no siendo por otra parte dicha prueba lo suficientemente clara, robusta y convincente como la ley y la jurisprudencia exigen, vistos los casos de *Sucesión Díaz* v. *Sucesión Díaz,* 17 D.P.R. 253; *Medina* v. *Sucesión Bird,* 30 D.P.R. 158; *Morales* vs. *Sucesión Cerame,* 30 D.P.R. 843.

"Se ha demostrado en este caso que Juan Buxó Ocasio tenía una concubina o querida, que (no) es la madre del demandante, llamada Cruz Rodríguez o González, con la cual vivió maritalmente durante casi toda su vida, por unos 55 años, y que falleció mientras sufría una enfermedad conocida con el nombre de hipertrofia prostática, o sea una inflamación de la glándula prostática que puede producir estirilidad. No hay prueba de ninguna clase acerca de que Juan Buxó Ocasio se ocupara de la educación del demandante, a pesar de que éste declara de que asistió a la escuela y sabe leer y escribir. La madre del demandante, Regina Fontánez Martínez, declaró que las medicinas y alimentos que Juan Buxó Ocasio le suministraba para su hijo, las tomaba por orden de él en la tienda de Esteban Hernández, hasta que éste quitó su establecimiento y su hijo estuvo grande, pero dicho Esteban Hernández que fué traído como testigo por el propio demandante nada declaró sobre este particular, a pesar de que fué llamado por dos veces, y se presume que su declaración sobre este extremo le era adversa al demandante, teniéndose como prueba voluntariamente suprimida. Art. 169, Ley de Evidencia. Regina Fontánez Martínez declaró además que durante los 4 años que vivió en unión de Juan Buxó Ocasio, a pesar de que él tenía otra concubina en el pueblo, iba a pasar todas las noches, diariamente, en su compañía; sin embargo, la noche del nacimiento del hijo en que hay personas presentes y pueden corroborar su testimonio, él no se encontraba allí. Se alega que Juan Buxó Ocasio reiteradas veces expresó su voluntad y su propósito de reconocer a Luis Fontánez como hijo suyo. La madre del demandante declaró simplemente que Juan Buxó Ocasio le prometió reconocer al hijo, que sería por su hijo. Pero de la declaración de Antonio Rotger aparece que Juan Buxó Ocasio le manifestó en distintas ocasiones que él nunca

había tenido hijos, a lo que el testigo le replicaba, refiriéndose al demandante, que el hijo era de él, aunque lo negara, y si bien dicho testigo expresó además que después de ponerle algunos ejemplos él asintió en reconocerlo como hijo suyo, no fué esto un acto espontáneo, libre y su no reconocimiento hasta su muerte demuestra que no tenía tal intención de reconocer. Y dando como cierto que Juan Buxó Ocasio llamara en algunas ocasiones hijo al demandante, lo bendijera, y le diera dinero, en una ocasión la suma de $25.00 cuando se fué al campamento, estos actos tampoco demuestran cumplidamente su intención de reconocer, ni la posesión continua del estado de hijo natural."

[1, 2] Es lástima que la única cuestión realmente en controversia haya sido confundida con cuestión tan impertinente como lo es la de concubinato y la naturaleza de la enfermedad que ocasionó la muerte del padre putativo. Se admite que ninguna de estas cuestiones está envuelta en el presente caso. Pero habiendo alegado el mismo demandante que hubo tal concubinato durante la concepción y el nacimiento, no puede quejarse, ni se queja, de que la corte inferior notara la falta de prueba en relación con una alegación tan innecesaria.

También es cierto que el juez de distrito no parece haber creído necesario discutir la prueba de la defensa, salvo el hecho probado del único verdadero estado de concubinato en el caso y la cuestión de la naturaleza de la última enfermedad ya mencionada. Pero la mera referencia a estas cuestiones en relación con la suficiencia de la prueba aducida en apoyo de la quinta alegación, indica claramente que lo que la corte tuvo en mente fué la prueba en conjunto y no la prueba del demandante en particular.

El contexto que sigue inmediatamente a tal referencia igualmente deja poco lugar a dudas en cuanto a que si tan sólo se tomó en consideración la prueba del demandante, la misma no fué aceptada como cierta, sino que por el contrario se consideró como contradictoria, poco satisfactoria y poco digna de crédito. Lo que el juez sentenciador admitió,

aunque aparentemente sólo para los fines de la argumentación, está claramente expuesto en la última oración del extracto que hemos hecho, y la proposición envuelta sin duda está basada en y sostenida por la opinión de esta corte en el caso de *Morales* v. *Sucesión Cerame,* 30 D.P.R. 843.

Pero el apelante insiste en que los hechos de este caso lo hacen caer dentro de la doctrina enunciada en los casos de *Jesús* v. *Sucesión de Pérez Villamil,* 19 D.P.R. 893; *Montalvo* v. *Montalvo,* 25 D.P.R. 858; *Vega* v. *Sucesión Vega,* 32 D.P.R. 595; y *Guadalupe* v. *González Cruz,* 34 D.P.R. 669.

Copiamos del alegato del apelante lo suficiente para indicar la teoría sobre la cual parece haberse entablado la presente acción:

"Recuérdese que a la luz del estatuto al cual se acoge la presente acción, y a la luz del fundamento filosófico y social de dicho principio legal, no es necesario en estos casos sino demostrar que el alegado padre natural realizó tales actos que llevan al ánimo de la córte la impresión de que en realidad aquél fué tal padre. La ley envuelta no dice qué actos es necesario probar. Deja todo ello, con un sentido sabio y humano, al criterio de los jueces, que son hombres y saben más o menos qué tratos ordinarios da un hombre a un hijo suyo.

"La investigación del acto genésico que determina la paternidad, por ser una investigación difícil y repulsiva, ha sido prohibida expresamente por la ley. Solamente dejó la ley, como para una protección constante de los derechos del hijo natural, la investigación de los actos directos del alegado padre natural en relación con el presunto hijo natural.

"Es natural y lógico que la jurisprudencia, al determinar esos actos justificativos de paternidad, haya considerado aquellas obligaciones que la ley natural y la ley positiva impone a los padres para con sus hijos, tales como alimentarles, tenerles en casa, educarles. Pero además, los tratadistas y la jurisprudencia han considerado otros actos. Es natural y de sentido común, que la relación de paternidad puede demostrarse por otros actos, aunque ninguno de esos otros actos fuera la alimentación, la vivienda ni la educación de la misma manera que es lógico que estos actos por sí solos no son inequívoca prueba de paternidad.

''No debe nunca olvidarse que lo que en estos casos la ley persigue, en cumplimiento de su profundo fundamento filosófico y social, es determinar si una persona es hijo natural de otra. Cualquier serie de actos que lleven al ánimo esa impresión de paternidad, es suficiente para que la corte, como un acto de justicia, dé sanción y reconocimiento legal al estado de cosas que crearon los sentimientos e instintos de dos seres humanos al confundirse en un acto genésico.

''No debe olvidarse que la letra de la ley ni el espíritu de esa ley envuelta en este pleito (art. 135, inciso 2, Código Civil Español)', no es exigir que se pruebe si una persona alimentó, educó o vivió con otra; lo que exige la ley es que se demuestre si una persona en relación con otra realizó actos directos que justifiquen la condición de padre a hijo, sean ya esos actos los referidos, o sean otros. Lo fundamental es demostrar si esos actos directos, cualesquiera que ellos fueran, justifican esa relación de padre a hijo.

''Así, interpretando dicho precepto legal y comentando jurisprudencia al efecto del Tribunal Supremo de España, el eminente jurista Manresa se expresa de la siguiente manera:

'' 'La posesión continua del estado de hijo natural, declara la sentencia de 7 de noviembre de 1896, ha de relevarse necesariamente por actos que demuestren con evidencia la voluntad del padre o de su familia, en su caso, de tener como tal hijo natural al que pretenda ese reconocimiento obligado, tales como tenerlo en casa, alimentarle, y educarle en tal concepto u otros análogos de tal valor y eficacia, que acreditan cumplidamente que el hijo mantiene con aquel carácter relaciones constantes con el autor de sus días, y en su defecto con la familia de éste.' (Manresa, Comentarios al Código Civil Español, Cuarta Edición, págs. 600 y 601).''

Estamos muy de acuerdo con Manresa, pero no podemos estar de acuerdo con la interpretación dada a la cita hecha por el apelante.

Manresa no discute la paternidad ni la manera de probarla, sino la posesión continua del estado de hijo natural definida por la Corte Suprema de España en su sentencia del 26 de junio de 1903, citada con aprobación y seguida por esta corte en el caso de *Montalvo* v. *Montalvo* y *Vega* v. *Sucesión Vega, supra,* así como la manera en que tal posesión

debe probarse.   Véase además el caso de *Alejandrina Montañez* v. *Fructuoso García, ante,* (pág. 223.)

Un cuidadoso estudio de toda la prueba no revela ningún· fundamento adecuado para que se dude seriamente de la conclusión a que llegó el juez de distrito.

*Debe confirmarse la sentencia apelada.*